IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMIE MILLER
o/b/o C.T. (a minor),

        **Plaintiff,**

   v.                                       **Civil Action 2:18-cv-514**
                                                  **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

## OPINION AND ORDER

     Plaintiff, Jamie Miller, acting on behalf of C.T., a minor, filed this action seeking review of a decision of the Commissioner of Social Security denying C.T.'s application for supplemental security income. For the reasons that follow, Plaintiff's Statement of Errors (Doc. 16) is **OVERRULED** and judgment is entered in favor of Defendant.

**I.    BACKGROUND**

     Plaintiff is C.T.'s mother, who filed an application for supplemental security income on his behalf on June 17, 2014, alleging he became disabled on March 13, 2014. (Doc. 11, Tr. 239). After initial administrative denials of the claim, an Administrative Law Judge ("ALJ") held a hearing on April 5, 2017. (Tr. 38–57). The ALJ issued a decision denying benefits on June 13, 2017. (Tr. 11–32).

     Plaintiff filed this action on May 24, 2018 (Doc. 1), and the Commissioner filed the administrative record on July 26, 2018 (Doc. 11). Plaintiff filed a Statement of Specific Errors (Doc. 16), the Commissioner responded (Doc. 17), and no reply was filed.

### A. Hearing Testimony

C.T. was born in 2009 (Tr. 14), and was 7-years-old at the time of the administrative hearing. (Tr. 41). The ALJ summarized the relevant hearing testimony:

> [T]he claimant's mother testified that claimant gets good grades but his behavior is a problem and he has been expelled more than ten times. She further testified that the claimant has household chores of cleaning the washroom, but he does not clean it without fighting. The claimant's mother also testified that the claimant will hit other children and he wets the bed at night and will wet his pants during the day. She additionally testified that the claimant would get up out of his seat during class and leave the classroom. She stated that she would get calls from the school every day regarding the claimant's behavior. Finally, the claimant's mother testified that the claimant is working with a speech therapist however, she cannot always understand [her child's] speech.

(Tr. 17).

### B. Educational Evidence

The ALJ also usefully summarized C.T.'s educational records:

> On March 14, 2014, the claimant's mother met with his school to establish an Individualized Education Plan (IEP). The claimant's IEP provided for speech therapy services, a specialized learning program with an intervention specialist/teacher, and noted that the claimant may benefit from strategies such as forced choices to help him feel in control, positive reinforcement, including praise, redirection to task, structured environment with clear rules and expectations. The claimant's follow up IEP meeting in March 2016, noted that the claimant still needs prompting and redirection in group settings and often times moves out of his seat. The March 2016, review also noted that the claimant will access a resource classroom focusing on behavior, reading, writing, and math, and be in a general education classroom for other areas. The claimant will also continue to receive specialized instruction in a speech-language therapy room.
>
> …
>
> The claimant had an Evaluation Team Report (ETR) re-evaluation, which noted that the claimant needed additional fine motor practice, as well as guided practice responding appropriately to his same-age peers and following directions from his teacher. The claimant should be given repeated directions from his teacher, additional positive reinforcement when performing correct behavior, reminders to stay in his seat, and preferential grouping to limit his distractions. The claimant was observed in the classroom on February 9, 2015, and was noted to be moving while in his seat and was able to participate in classroom activities. He was able to

move to his assigned group and complete an activity sorting pictures. While he moved out of his seat several times during the observation he was easily redirected. Testing showed that letter and word recognition, reading comprehension, and written expression were all in the average range, while math concepts and applications were noted to be in the below average range.

…

On October 4, 2016, the claimant was suspended from school for two days as a result of inappropriate language and exposure of his private parts. The claimant was suspended for two days in December 2016, for hitting another student, cursing at a student, telling his teacher no, and trying to leave the recovery room.

…

The claimant's third quarter interim report from . . . school noted that he was meeting the standards for mathematics, however he needed improvement in reading, language arts, and science. The claimant had an annual review of his IEP on March 2, 2017, and it was noted that he was in a general education classroom and receiving speech services as well as services in the resource room with the intervention specialist in the areas of math, reading, behavior, and writing. His teacher noted that the claimant was in a general education classroom for the majority of the day, with some difficulty, as the claimant had difficulty sitting in a whole group setting and could only stay on task for approximately ten to fifteen minutes; which is about half the time of his same age peers. The review further noted that the claimant would steal food from other students and is often aggressive or inappropriate during lunch. The review also noted that the claimant's social interactions were a concern and the claimant has difficulty respecting the personal space of others. The claimant was slightly behind his same age peers in reading and excels in math. The review noted that the claimant would be given accommodations such as: small groups, preferential seating, extended time for assignments, positive reinforcement for good behavior, shorter assignments, sensory breaks, and the use of a compression vest.

In February 2017, the claimant was suspended on multiple occasions for hitting other students, throwing objects, and for inappropriately touching other students. The claimant was suspended on April 13, 2017, for one day due to making threats with a makeshift gun.

…

[K.K.], early childhood intervention specialist, completed a teacher questionnaire on February 24, 2015, noting that the claimant has a pre-school IEP under the category of developmental delay. [She] opined that under the category of acquiring and using information the claimant has no more than slight problems. She noted that the claimant was impulsive and often speaks out of turn and leaves his seat.

3

She further noted that he misses instructions due to his distractability and needs reminders to stay quiet in class until he is called upon. In the area of attending and completing tasks, [K.K.] noted obvious problems paying attention when spoken to, refocusing to task when necessary, waiting to take turns, and working without distracting himself or others. The remaining areas were marked as either a slight problem or no problem. [K.K.] noted that the claimant was disruptive to the class with talking out of turn and making noises, and he needed many reminders. Under the area of interacting and relating with others, [K.K.] opined that claimant had an obvious problem with following the rules. All other areas under this section were noted to be either no problem or a slight problem. [K.K.] noted under this section that the claimant needs adult facilitation for some conflict resolution with peers. Positive reinforcement is used in the classroom and have significantly reduced his frustrations. No problems were indicated regarding the claimant's health and physical well-being and, other than a slight problem managing his pace of physical activities or tasks, no problems were noted moving about or manipulating objects. Under the area of caring for himself, [K.K.] noted an obvious problem being patient when necessary, however, the remaining areas were noting to have either a slight problem or no problems. She noted that the claimant is impulsive and needed reminders for asking permission before doing something and for his safety. . . .

. . .

[S.S.], the claimant's kindergarten teacher, completed a school activities questionnaire on December 14, 2015, and noted that the claimant is on an IEP and he has a limited attention span and concentration in class, and he struggles to follow instructions. [S.S.] noted that he is highly distracted but can work independently of teacher supervision sometimes. Further, [S.S.] opined that the claimant can usually adapt to a change in his routine but will shut down when criticized. He is progressing with learning the skills involved in reading, writing, and mathematics although is inattentiveness impedes his progress compared to his peers. [S.S.] also opined that the claimant was very distracted and impulsive, always touching, struggled with space and reading other people's reactions to his actions. The claimant had age-appropriate self-care, excellent attendance, and was able to keep up with his same age peers in extracurricular activities . . .

(Tr. 18–24 (internal citations omitted)).

C. **Relevant Medical Evidence**

Again, the ALJ's summary is helpful here:

The claimant received behavioral health counseling at Ohio GuideStone and on August 21, 2014, the claimant and his mother met with [H.C.], the claimant's caseworker. During this appointment, [H.C.] helped the claimant develop an individualized service plan (ISP) and she noted that the claimant needed extra time to understand goals, methods and problems. [L.L.], LISWS completed a medical

4

necessity determination on August 24, 2014, and stated that the claimant had a moderate impairment of functioning and a moderate degree of symptoms. She further noted that treatment was medically necessary to help his functioning in the areas of family relations and his mood, and would consist of behavioral health counseling. [She] . . . stated that without the treatment the claimant would suffer prolonged or new symptoms or impairments of functioning and that he had a moderate level of symptoms that severely impaired his functioning. . . . On September 4, 2014, the claimant met with [H.C.] and she noted that the claimant was unable to practice his coping skills as he was too distracted and running around during the appointment.

On January 19, 2015, the claimant was seen for a psychiatric evaluation by Leslie Markowitz, Psy.D., at the Cleveland Clinic Center for Autism. Elaine Sculte, M.D., examined the claimant on January 19, 2015, and she noted that the claimant had no regression of developmental milestones, except for toileting, as the claimant is not toilet trained. Dr. Schulte's examination was negative and she diagnosed the claimant with autism spectrum disorder and nocturnal enuresis. Dr. Schulte concluded that claimant's daytime wetness is related to his behavioral issues. Dr. Markowitz concluded that claimant's testing, combined with the reported history, support a diagnosis of autism spectrum disorder. Furthermore, Dr. Markowitz noted that the claimant had impaired speech production skills, reduced speech intelligibility, and social/pragmatic language deficits, which supported a diagnosis of other developmental speech or language disorders. Dr. Markowitz stated that the claimant would benefit from services through the Ohio Department of Developmental Disabilities and was advised to follow up with the Cleveland Clinic in three months. On January 28, 2015, the claimant had a speech and language evaluation as part of his assessment by the Cleveland Clinic Center for Autism conducted by Melissa Yusko, M.A., CCC/SLP. Ms. Yusko administered the Clinical Evaluation of Language Fundamentals – Preschool; Second Edition (CELF Preschool – 2) and the results suggested that the claimant had impairments in his communication abilities. Ms. Yusko noted that the claimant had difficulty with consistent eye contact, following multi-step commands, and had decreased speech intelligibility, as well as difficulty sustaining conversation. The claimant was seen at the Cleveland Clinic Center for Autism on February 9, 2015, by Dr. Markowitz and was diagnosed with autism spectrum disorder and other developmental speech or language disorder and was referred out for treatment at that time.

…

The claimant was evaluated at Ohio Guidestone Mental Health on August 26, 2015, secondary to aggressive behaviors towards family and strangers. During the assessment, the claimant's mother noted that he had difficulty in school and at home with significant impairment of social interaction. [J.P.], a therapist, noted that the claimant appeared inattentive and distracted throughout the assessment by not responding to questions he was directly asked. The claimant's mother noted that the claimant had a short attention span and he gets overstimulated in a large setting

5

like a school. Amanda Wattenberg, IMFT, LICDC, completed a form regarding the medical necessity of counseling for the claimant on September 4, 2015, and noted that without treatment the claimant would be expected to suffer prolonged, increased, or new symptoms or impairment of functioning and that the claimant had a moderate severity of symptoms and a serious functional impairment. The treatment records from 2015 note that the claimant was being seen to improve his impulse control and behavior. On October 21, 2015, the claimant reported that he was in PEAK for fighting and wanted to do better. During his December 29, 2015, visit the claimant reported that he was being good and controlling his behaviors in a positive way.

Ohio Guidestone treatment records from 2016 show that the claimant was meeting with his therapist to manage his behavior and impulsivity. The claimant's therapist met with school staff to find ways to integrate behavioral expectations with educational objectives. During his April 20, 2016, visit, the claimant was noted to have a lack of eye contact and a lack of responsiveness to verbal commands. On April 26, 2016, the claimant's teacher and bus driver met with the claimant's therapist and noted that the claimant was "more grabby than usual." [J.P.], the claimant's therapist, met with the claimant's teacher on May 26, 2016 who noted that the claimant had good behavior during the week, except for the day of the appointment where the claimant had an incident with shoving and grabbing. On June 21, 2016, the claimant's mother noted that she felt the claimant was more impulsive during the summer. [J.P.] noted during the claimant's July 12, 2016, appointment that the claimant was distracted and that the library security repeatedly told the claimant not to run around. During his July 19, 2016, visit, the claimant stated that he tried to be good but he would have a bad day if he did not get what he wanted. On September 12, 2016, the claimant's mother noted that the claimant had changed his behaviors. During his September 26, 2016, appointment, the claimant stated that he was doing well in class, and was making friends.

…

The claimant had counseling session throughout January 2017, to address relaxation and focus skills. The claimant was seen by [C.P.] on January 23, 2017, for a counseling session and [C.P.] noted that the claimant was in an impulsive mood and was continuously interrupting during play therapy.

On February 2, 2017, the claimant and his teachers talked with [C.P.], his caseworker to discuss the claimant's increased impulsivity and violence toward other children. [C.P.] and the teachers identified interventions that can be done to positively influence the claimant's behavior, such as smaller classroom size. The claimant and his mother met with [C.P.], his caseworker, several times in February 2017, to discuss steps to take at school and home to establish support for the claimant managing his symptoms and his behavior. On March 15, 2017, the claimant met with his caseworker, [C.P.], for a counseling session to work on sensory interventions to improve his impulse control.

…

[D.B.], SLP completed an assessment on October 21, 2014, regarding the claimant's speech and opined that the claimant had [80%] intelligibility in conversation in a known context versus [60%-65%] in an unknown context. [D.B.] noted that the claimant had an adequate ability to imitate words and limited stimulability of age appropriate phonemes. [She] noted that the claimant was non-verbal at first but quickly started communicating verbally with words and sentences. . . .

Christopher Ward, Ph.D., examined the claimant on October 15, 2014, and following his examination diagnosed the claimant with an unspecified neurodevelopmental disorder as well as an adjustment disorder with mixed disturbance of emotions and conduct. Dr. Ward noted that the claimant presented with delays completing basic verbal skills and distractions, which may lead to difficulty acquiring new information. However, Dr. Ward noted that the claimant was able to talk with him in an age appropriate manner during the examination. Dr. Ward further opined that the claimant displayed adequate task persistence when answering questions, however, he noted that he did have to repeat questions as the claimant displayed indications of inattentiveness. Dr. Ward opined that the claimant would have difficulty understanding and responding to teacher requests due to his difficulty understanding concepts and his history of behavior problems. Finally, Dr. Ward opined that the claimant had less than age appropriate management of self-care with behavioral outbursts, sexualized behavior problems and difficulty carrying out multi-step tasks due to his distraction. . . .

[J.P.], one of the claimant's prior therapists, completed a questionnaire regarding the claimant's limitations on January 28, 2016, opining that the claimant had moderate limitations acquiring and using information, marked limitations attending and completing tasks, marked limitations interacting and relating with others, no limitation moving about and manipulating objects, moderate limitations caring for himself, and no limitation in his health and physical well-being. . . .

[C.P.], the claimant's therapist completed an opinion regarding the claimant's limitations on April 5, 2017. [C.P.] opined that the claimant would have a moderate limitation acquiring and using information, a marked limitation attending and completing tasks, an extreme limitation interacting and relating with others, no limitations moving about and manipulating objects, a marked limitation caring for himself, and a marked limitation with his health and physical well-being. [C.P.] noted that the claimant had been suspended from school, which affected his attendance and needed ongoing therapy as well as support at school and home. . . .

State agency medical and psychological consultants reviewed this claim at the initial and reconsideration levels. The State agency medical sources opined that the claimant had a less than marked limitation: acquiring and using information;

> attending and completing tasks; and caring for himself. They further opined that the claimant had a marked limitation interacting and relating with others and no limitation moving about and manipulating objects or with his health and physical wellbeing. . . .

(Tr. at 18–23 (internal citations omitted)).

### D. The ALJ's Decision

The ALJ first found that C.T. was a preschooler when the application was filed and a school-age child as of the date of the decision. (Tr. 14). Next, he found that C.T. had not engaged in substantial gainful activity since his application date. (*Id.*). At the next step of the sequential evaluation process, the ALJ concluded that C.T. had severe impairments including autism spectrum disorder, unspecified neurodevelopmental disorder, speech and language delay, affective disorder, and attention deficit disorder/attention deficit hyperactivity disorder (ADD/ADHD). (*Id.*). The ALJ also found that C.T.'s impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments, or functionally equal those requirements. (*Id.*).

The ALJ then reviewed C.T.'s educational records, C.T.'s medical records, and the opinion evidence contained in the record. (Tr. at 18–25). In reviewing the six domains of functioning that are pertinent to a child's benefits application, the ALJ determined that C.T. had: marked limitations in interacting and relating with others; less than marked limitations in acquiring and using information, attending and completing tasks, and caring for himself; and no limitations in moving about and manipulating objects or in health and physical well-being. (Tr. 25–31). Because a finding of one "extreme" limitation or two "marked" limitations is needed in order to support an award of benefits, the ALJ denied Plaintiff's claim. (Tr. 32).

## II. STANDARD OF REVIEW

The Sixth Circuit has summarized the regulations concerning a child's application for

disability benefits, stating:

> The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? * * * An impairment can equal the listings medically or functionally * * *. The criteria for functional equivalence to a listing are set out in § 416.926a. That regulation divides function up into six "domains":
>
> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and
> (6) Health and physical well-being.
>
> § 416.926a(b)(1). To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:
>
> "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.
>
> § 416.926a (e)(2)(i).
>
> "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.
>
> § 416. 926a (e)(3)(i).

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009).

In the context of that legal framework, this Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015);

9

*see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

Plaintiff appears to assert two assignments of error: (1) the ALJ's analysis of the opinion evidence was erroneous, and (2) substantial evidence supported the finding that C.T. had a marked limitation in the domain of caring for self. (Doc. 16 at 12–19).

### A. Opinion Evidence

Plaintiff argues that the opinion evidence offered by his treating therapist, intervention specialist, and teacher establish that he had marked limitations in caring for himself. (Doc. 16 at 14–19). According to Plaintiff, the ALJ "failed to provide any meaningful analysis" as to why he did not accept their opinions. (*Id.* at 14–15).

Under the regulations, therapists, intervention specialists, and teachers are considered "other sources," rather than acceptable medical sources. SSR 06–3p, 2006 WL 2329939, at *1–2.[1] Although information from other sources cannot establish the existence of an impairment, it

---

[1] "SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date." *Hoffman v. Comm'r of Soc. Sec.*, 2019 WL 697788, at *7 (S.D. Ohio Feb. 20, 2019) (citing 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017)). Because Plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

"may provide insight into the severity of the impairment," and how it affects the individual's ability to function. *Id.* at *2–3. In evaluating the opinions of "other sources," an ALJ should consider a number of factors, including how long the source has known the claimant, how consistent the source's opinion is with other evidence, and how well the source's opinion is explained. *Id.* at *5–6. Further, an ALJ:

> generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case.

*Id.* at *6.

The ALJ satisfied those requirements here. First, the ALJ reviewed the opinion evidence presented by C.T.'s early childhood intervention specialist, K.K. (Tr. 21–22). He noted that K.K. completed a teacher questionnaire regarding C.T.'s functional limitations in which she opined that, "[u]nder the area of caring for himself," he had "an obvious problem being patient when necessary," but that he had "slight or no problem" in the remaining areas. (Tr. 22). The ALJ gave "great weight" to K.K.'s questionnaire because, "[a]s the claimant's intervention teacher," she was "in position to give an independent opinion of the claimant's limitations" and her opinion was "consistent with other medical opinions" and C.T.'s "educational records." (*Id.*). In short, the ALJ found that K.K.'s opinion was entitled to great weight based on her relationship with C.T. and the fact her opinion was consistent with the record as a whole. That is all the regulations require. *See* SSR 06–3p, 2006 WL 2329939, at *5–6.

Plaintiff's real complaint is not with the weight given to K.K.'s opinion, but rather the ALJ's failure to find that Plaintiff was markedly limited in the domain of caring for himself based on K.K.'s opinion. (Doc. 16 at 17). But a fair reading of K.K.'s opinion questionnaire does not support Plaintiff's desired conclusion. (*See* Tr. 282). K.K. found that C.T. had less than serious

11

problems in all of the ten categories within the caring for himself domain and that for eight of the ten categories he had no problem or a slight problem. (*Id.*). Indeed, she opined that C.T. had "[g]ood self-help skills," but was "[i]mpulsive" so he needed reminders "for safety." (*Id.*). These findings are not indicative of a marked limitation. *See Kelly*, 314 F. App'x at 832 ("Marked limitation also means a limitation that is more than moderate but less than extreme." (citation and internal quotations omitted)).

Second, the ALJ considered the opinion evidence presented by C.T.'s therapist, C.P. (Tr. at 23). In particular, he reviewed C.P.'s questionnaire for health care professionals on medical and functional equivalence. (*Id.*). Finding that C.P.'s opinion was entitled to little weight, the ALJ emphasized that C.P's statement was "not consistent with other evidence in the file, including the educational records. Specifically, the teacher questionnaire discussed above opines limitations significantly less than [C.P.] has opined." (*Id.*). Further, the ALJ observed, "the State agency medical and psychological consultants opinions . . . opine limitations less than those stated by C.P." (*Id.*).

Plaintiff insists that this analysis is insufficient. The Court disagrees. "The consistency of a medical opinion with other evidence in the record is one factor that may be considered in evaluating medical opinion evidence." *Hale v. Berryhill*, No. 18-2484-TMP, 2019 WL 1978477, at *3 (W.D. Tenn. May 3, 2019) (citing SSR 06-03P, 2006 WL 2329939, at *4). Here, the ALJ's consideration of that factor "was sufficient to allow a subsequent reviewer to follow the ALJ's reasoning where the ALJ made sufficient factual findings elsewhere to support his conclusion." *Hale*, 2019 WL 1978477, at *3 (citing *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016)); *see also Bowman v. Comm'r of Soc. Sec.*, 683 F. App'x 367, 374 (6th Cir. 2017) (Notwithstanding Bowman's contentions, the ALJ properly evaluated Williams's April 2012

opinion under SSR 06-03p. As the ALJ noted, Williams's opinion was inconsistent with Bowman's treatment history and the record as a whole.").

Plaintiff relies on *Lorman v. Commissioner of Social Security*, 107 F. Supp. 3d 829 (S.D. Ohio 2015), but it does not suggest otherwise. There, the ALJ discounted the opinion of the claimant's treating therapist based on the opinion of a one-time evaluating physician. *Id.* at 835–36. The Court found that was erroneous based on the therapist's 14-month treatment relationship with the claimant and the fact that plaintiff's alleged mental health symptoms emerged after his visit with the one-time evaluating physician. *Id.* at 836.

Plaintiff has not explained how *Lorman* is relevant to this case. (*See* Doc. 16 at 16–17). And the facts available make clear that it is not. Unlike *Lorman*, here, the ALJ discounted C.P.'s opinion here because it was inconsistent with C.T.'s educational records and the opinions of the state agency consultants. (Tr. at 23). C.P. had a treating relationship with C.T. for six months prior to completing the opinion questionnaire. (Tr. 761). C.T.'s educational records from 2014 through 2017 contradicted C.P.'s opinion as to C.T.'s limitation in the domain of caring for himself. *See supra*, Section II(B). The ALJ, therefore, did not err when he discounted C.P.'s opinion in evaluating C.T.'s limitations in caring for himself. *See* SSR 06-03P, 2006 WL 2329939, at *5–6.

Third, the ALJ analyzed the opinion evidence presented by C.T.'s kindergarten teacher, S.S. (Tr. at 24). He gave S.S.' opinion "partial weight," noting that "she had only known the claimant for three months at the time she provided [her] opinion." (*Id.*). Nonetheless, he credited S.S.' opinions regarding C.T.'s limitations in the domains of acquiring and using information and interacting and relating with others. (*Id.*).

Plaintiff maintains that the ALJ erred in his analysis of S.S.' opinion because the ALJ "fail[ed] to identify which portions" of the teacher's opinion he assigned partial weight to "when addressing the domain of caring for self." (Doc. 16 at 17). Beyond this conclusory assertion, Plaintiff does not develop this argument, and the Court is unable to find any authority to support it. The ALJ reviewed S.S.' opinion, noted the limited time S.S. had known C.T., assigned her opinion partial weight accordingly, and credited her opinion with respect to C.T.'s limitations in acquiring and using information and interacting and relating with others. Implicit in this analysis is the conclusion that S.S.' opinion was either not relevant or not credible with respect to C.T.'s ability to care for himself. Because the ALJ explained the weight given to S.S.' opinion and ensured his discussion of the evidence allowed the Court to follow his reasoning, the Court finds no error here.

### B. Substantial Evidence

Although Plaintiff's Statement of Errors focuses primarily on the ALJ's analysis of the opinion evidence, Plaintiff's cumulative argument is that substantial evidence exists to support a finding that C.T. has a marked limitation in the domain of caring for himself. (Doc. 16 at 14–19).

But this argument misunderstands the standard of review applicable to the ALJ's decision. The question the Court must answer is whether substantial evidence supports the ALJ's conclusion that C.T. had a less than marked limitation in the domain of caring for himself. *Winn*, 615 F. App'x at 320 (holding that courts are "limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards"). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (6th Cir. 2007) (quoting *Cutlip*, 25 F.3d at 286).

"If substantial evidence supports the Commissioner's decision, [courts must] defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (citation and quotations omitted).

Because that is what occurred here, the Court must defer to the ALJ's findings. In his decision finding that C.T. had a less than marked limitation in caring for himself, the ALJ cited substantial evidence in support of his conclusion. (Tr. at 30 ("The claimant's mother noted in a form that the claimant was able to care for his personal needs. The teacher questionnaire noted an obvious problem being patient, however, no more than a slight limitation in any other area under this section. Following his examination, Dr. Ward opined that the claimant had less than age appropriate management of his self-care. Additionally, the State agency review found at both the initial and reconsideration levels found [sic] a less than marked limitation in this area.")). The record confirms that substantial evidence supports this conclusion. *See supra*, Section I. Although Plaintiff has cited evidence purportedly showing a marked limitation in his ability to care for himself, he has not shown that the ALJ's conclusion was outside the ALJ's permissible "zone of choice" that grants the ALJ discretion to make findings without "interference by courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009).

### C. CONCLUSION

Based on the foregoing, Plaintiff's Statement of Errors (Doc. 16) is **OVERRULED** and judgment is entered in favor of Defendant.

IT IS SO ORDERED.

Date: June 27, 2019 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE